

**IT IS ORDERED as set forth below:**

**Date: November 16, 2020**

_____

**Barbara Ellis-Monro**
**U.S. Bankruptcy Court Judge**

_____

## UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF GEORGIA
### ROME DIVISION

| | |
|---|---|
| IN RE: | |
| | CASE NO. 17-41677-BEM |
| BEAULIEU GROUP, LLC AND BEAULIEU TRUCKING, LLC, | |
| Debtors. | |
| | CHAPTER 11 |
| ENGINEERED FLOORS, LLC, | |
| Plaintiff, | |
| | ADVERSARY PROCEEDING NO. |
| v. | 18-4031-BEM |
| BEAULIEU OF AMERICA, INC.; BEAULIEU GROUP, LLC; PMCM 2, LLC in its capacity as the liquidating trustee for the Estates of Beaulieu Group, LLC, et al.; and LAKESHORE EQUIPMENT COMPANY D/B/A LAKESHORE LEARNING MATERIALS, | |
| Defendants. | |

## **O R D E R**

This matter is before the Court on the Amended Motion for Partial Summary Judgment filed by Defendant Lakeshore Equipment Company ("Lakeshore") [Doc. 47], the Motion for Summary Judgment filed by Defendants Beaulieu Group, LLC ("Beaulieu") and Phoenix Corporate Recovery Services, LLC f/k/a PMCM 2, LLC (the "Liquidating Trustee" and with Beaulieu the "BLT Defendants") [Doc. 94], and the Motion to Compel Discovery filed by Plaintiff Engineered Floors, LLC ("EF") [Doc. 126].

## I. Background

The parties to this proceeding are EF, which purchased certain assets from Beaulieu in its bankruptcy case under an Asset Purchase Agreement (the "APA") [Case No. 17-41677, Doc. 297, Ex. A & Doc. 335] that was approved by order of the Court (the "Sale Order") [Id. Doc. 345]; Defendant Lakeshore, which purchased carpet from Beaulieu prior to the closing of the APA and from EF after the closing of the APA; Beaulieu of America, Inc. and Beaulieu (the "Debtors"); and the Liquidating Trustee. EF filed an amended complaint seeking to resolve issues regarding EF's liability to Lakeshore for alleged defects in carpeting EF sold to Lakeshore, some of which was manufactured in whole or in part by Beaulieu and was purchased by EF under the APA (the "Amended Complaint" or "AC") [Doc. 79]. This proceeding arises from claims by Lakeshore for defective carpeting that fall into three different categories or buckets. Bucket 1 claims involve carpet manufactured by Beaulieu and sold to Lakeshore by Beaulieu. Bucket 2 claims involve carpet manufactured in whole or in part by Beaulieu and sold to Lakeshore by EF. Bucket 3 claims involve carpet manufactured by EF and sold to Lakeshore by EF.

EF's Amended Complaint contains the following counts: (1) declaratory judgment against Lakeshore and the Liquidating Trustee; (2) specific performance of the APA and enforcement of the Sale Order against Lakeshore and the Liquidating Trustee; (3) breach of

contract and duty of good faith and fair dealing against the Liquidating Trustee; (4) money had and received, constructive trust against the Liquidating Trustee; (5) unjust enrichment against the Liquidating Trustee; (6) apportionment, indemnity, and contribution against the Liquidating Trustee; (7) injunction against Lakeshore; (8) allowance of administrative expense priority claim to the extent of benefit to the estate against the Liquidating Trustee; (9) civil contempt against Lakeshore; and (10) bad faith attorney fees against Lakeshore.

The Liquidating Trustee asserted a counterclaim objecting to EF's administrative expense claim (the "EF Claim"). [Doc. 80]. Lakeshore asserted the following counterclaims: (1) breach of implied-in-fact contract; (2) breach of contract; (3) breach of implied warranty of merchantability; (4) breach of implied warranty of fitness for a particular purpose; (5) breach of express warranties; (6) negligent misrepresentation; (7) breach of the implied covenant of good faith and fair dealing; (8) declaratory relief; and (9) transfers of claims to California. [Doc. 15 and Doc. 84 ¶ 132].

On June 2, 2020, the Court entered an order in the bankruptcy case approving a settlement between the Liquidating Trustee and Lakeshore. [Case No. 17-41677, Docs. 1928, 1944]. Under the settlement, all of Lakeshore's claims against the estate (including the Bucket 1 claims) will be resolved by allowance of Lakeshore's administrative expense claim in the amount of $102,500.[1] However, the settlement is contingent upon (1) the EF Claim either being disallowed or withdrawn, and (2) the dismissal of the BLT Defendants from this proceeding, both of which must occur by December 31, 2020.

The BLT Defendants' Motion for Summary Judgment (the "BLT Motion") seeks summary judgment on all claims against them and on their counterclaim objecting to the EF Claim.

---

[1] Lakeshore had filed a Request of Allowance and Payment of Administrative Expense Claim in the amount of $1,444,622.42. [Case No. 17-41677, Doc. 911].

3

Lakeshore's Motion for Partial Summary Judgment (the "LS Motion") seeks an order finding that the Sale Order does not grant EF immunity from liability for defective products that were either (1) manufactured by Beaulieu and shipped by EF, or (2) manufactured and shipped by EF. Lakeshore also joined in the BLT Motion. [Doc. 105].

## II. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Fed. R. Civ. P. 56(a), (c); Fed. R. Bankr. P. 7056. The Court will only grant summary judgment when the evidence, viewed in the light most favorable to the nonmoving party shows no genuine dispute of material fact. *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986). A fact is material if it "might affect the outcome of the suit under the governing law …." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party has the burden of establishing its entitlement to summary judgment. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). For issues on which the moving party would bear the burden of proof at trial, it "must affirmatively show the absence of a genuine issue of material fact, and support its motion with credible evidence demonstrating that no reasonable jury could find for the non-moving party on all the essential elements of its case." *Landolfi. v. City of Melbourne, Fla.*, 515 F. App'x 832, 834 (11th Cir. 2013). When "the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways—by either (1) negating an essential element of the non-movant's case or (2) by showing that

4

there is no evidence to prove a fact necessary to the non-movant's case." *Wynn v. Paragon Systems, Inc*., 301 F. Supp.2d 1343, 1349-50 (S.D. Ga. 2004) (citing *Clark v. Coats & Clark, Inc*., 929 F.2d 605, 606-08 (11th Cir. 1991)); *see also Celotex*, 477 U.S. at 323, 325, 106 S. Ct. at 2553, 2554 (stating that Rule 56 does not *require* "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim" but that the moving party may satisfy its burden by "pointing out to the district court … that there is an absence of evidence to support the nonmoving party's case.") (emphasis in original); *see also Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115-16 (11th Cir. 1993). The moving party must identify the pleadings, discovery materials, or affidavits that show the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553. Once this burden is met, the nonmoving party cannot merely rely on allegations or denials in its own pleadings. *Hairston v. Gainesville Sun Publ'g. Co.*, 9 F.3d 913, 918 (11th Cir. 1993). Rather, the nonmoving party must present specific facts supported by evidence that demonstrate there is a genuine material dispute. *Id.*

When the material facts are not in dispute, the role of the Court is to determine whether the law supports a judgment in favor of the moving party. *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511. "[W]hen the only question is what legal conclusions are to be drawn from an established set of facts, the entry of a summary judgment usually should be directed." Wright & Miller, 10A Fed. Prac. & Proc. Civ. § 2725 (4th ed.).

**III. Undisputed Facts**

The motions for summary judgment were filed by two separate defendants and are different in scope. Each motion is accompanied by a statement of facts to which the movant contends there is no dispute, and to which EF responded: Lakeshore's *Statement of Undisputed Material Facts in Support of Amended Motion for Partial Summary Judgment* ("LS SMF") [Doc.

48], EF's response to the LS SMF [Doc. 61], the BLT Defendants' *Statement of Material Fact as to Which Phoenix Corporate Recovery Services, LLC f/k/a PMCM 2, LLC Contends No Genuine Issue Exists to be Tried* (the "BLT SMF") [Doc. 96], and EF's response to the BLT SMF [Doc. 112]. While the two statements of fact overlap to some extent, each statement contains facts not included in the other statement, although Lakeshore adopted the BLT SMF when it joined the BLT Motion in all respects. [Doc. 105].

In its responses, EF sets forth a number of facts it contends are material and in dispute, and it has sought additional discovery prior to a decision on the Motions. [Doc. 61 at 10-12; Doc. 112 at 10-14; Doc. 126]. Under Rule 56(d), "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: … (2) allow time … to take discovery[.]" Fed. R. Civ. P. 56(d)(2). A motion under Rule 56(d)[2] may be granted when the nonmovant "specifically demonstrate[s] how postponement of a ruling on the motion will enable [it], by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact." *Wallace v. Brownell Pontiac-GMC Co., Inc.*, 703 F.2d 525, 527 (11th Cir. 1983) (internal quotation marks and citations omitted). The disputed facts set forth in Docs. 61 and 112 generally go to the validity and amount of Lakeshore's claims for defective carpet, whether Lakeshore had notice of the bankruptcy case and the APA, and legal issues rather than factual issues. None of the asserted disputed facts are material, as they do not affect the outcome of the Motions under applicable law. As explained in further detail below, the key legal question underlying both motions for summary judgment is whether the BLT Defendants have any potential liability to EF or Lakeshore for the Bucket 2 claims, which is a question of

---

[2] EF cites to Rule 56(d) in its *Memorandum in Support of Motions to Compel, for Leave to File Sur-Reply and Other Relief Against the BLT Defendants* in requesting that discovery be sequenced to develop evidence first on the issue of whether Lakeshore is bound by the APA and Sale Order and second on the issue of which of the alleged defective carpet was made and sold by Beaulieu vs. EF. [Doc. 127 at 3, 13].

interpretation of the APA under Georgia contract law, the Court's interpretation of its Sale Order, and the law governing the sale of goods.

The Court finds the undisputed material facts to be as follows:

Beaulieu was in the business of manufacturing and selling carpet and other flooring materials. [LS SMF ¶ 1, Doc. 61 ¶ 1]. On July 16, 2017, Beaulieu filed for relief under Chapter 11 of the Bankruptcy Code (the "Petition Date"). [LS SMF ¶ 2, Doc. 61. ¶ 2; BLT SMF ¶ 1; Doc. 112 ¶ 1]. Prior to June 4, 2018, the Debtors were authorized to operate their business as debtors in possession. [BLT SMF ¶ 2; Doc. 112 ¶ 2; LS SMF ¶ 6, Doc. 61 ¶ 6]. No trustee or examiner was either requested or appointed in the bankruptcy case. [BLT SMF ¶ 3; Doc. 112 ¶ 3]. On March 14, 2018, the Debtors, and the Official Committee of Unsecured Creditors filed the First Amended Joint Plan of Liquidation (the "Plan"). [BLT SMF ¶ 4; Doc. 112 ¶ 4]. EF did not object to the Plan. [BLT SMF ¶ 5; Doc. 112 ¶ 5]. On May 2, 2018, the Court entered an order confirming the Plan. [LS SMF ¶ 5, Doc. 61 ¶ 5; BLT SMF ¶ 6; Doc. 112 ¶ 6].

On June 4, 2018 ("the Effective Date"), pursuant to the terms of the Plan, all of the assets of Beaulieu, including all causes of action belonging to Beaulieu, were transferred to the Beaulieu Liquidating Trust (the "Trust"), and the Liquidating Trustee was appointed as the liquidating trustee of the Trust. [BLT SMF ¶ 7, 9; Doc. 112 ¶ 7, 9]. In addition, the Plan provided that the "[t]he Liquidating Trust will not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth [in the Plan] or in the Liquidating Trust Agreement." [BLT SMF ¶ 10; Doc. 112 ¶ 10].

On October 6, 2017, the Debtors filed their *Motion for Entry of Order (I) Authorizing the Sale of Assets Free and Clear of Liens, Claims and Encumbrances; (II) Granting First Request for Authority to Assume and Assign Executory Contracts and Unexpired Leases and*

*Establishing Cure Costs in Connection Therewith; (III) Granting Related Relief* (the "Sale Motion"). [BLT SMF ¶ 11; Doc. 112 ¶ 11]. By the Sale Motion, the Debtors sought approval from this Court to sell substantially all of their non-real estate assets to EF, and certain real property to Pentz Street Holdings, LLC ("Pentz"), pursuant to the terms of the APA, dated October 5, 2017. [BLT SMF ¶ 12; Doc. 112 ¶ 12]. On or about November 1, 2017, the Court entered the Sale Order approving the motion. [LS SMF ¶ 4, Doc. 61 ¶ 4; BLT SMF ¶ 14; Doc. 112 ¶ 14]. Pursuant to the terms of the Sale Order, the Debtors sold substantially all of their personal property assets to EF and certain real property to Pentz. [BLT SMF ¶ 15; Doc. 112 ¶ 15]. The total purchase price paid by the non-Beaulieu parties to the APA was $90,000,000.00, of which EF paid $73,800,000.00 and Pentz paid $16,200,000.00. [BLT SMF ¶ 16; Doc. 112 ¶ 16]. The sale closed effective as of 12:01 a.m. on November 6, 2017 (the "Closing Date"). [BLT SMF ¶ 17; Doc. 112 ¶ 17].

For more than fifty years, Lakeshore has been supplying educational and learning materials to teachers and children, and Lakeshore sells "Comfy Carpets" for children to use in the classroom or at home. [LS SMF ¶ 7-8, Doc. 61 ¶ 7-8]. Lakeshore purchased carpet and other flooring materials from Beaulieu prior to the Petition Date. [LS SMF ¶ 9, Doc. 61 ¶ 9; BLT SMF ¶ 19; Doc. 112 ¶ 19]. Before the Petition Date, Lakeshore issued purchase orders on May 9, 2017[3], July 5, 2017, and June 12, 2017, whereby Lakeshore ordered rolls of carpeting from the Debtors. [LS SMF ¶ 10, Doc. 61 ¶ 10; BLT SMF ¶ 18; Doc. 112 ¶ 18]. After the Petition Date, Lakeshore issued a purchase order on July 19, 2017, whereby Lakeshore ordered additional rolls of carpeting from the Debtors. [LS SMF ¶ 12, Doc. 61 ¶ 12]. Each of these purchase orders (the "Pre-Closing POs") contained the following terms:

> If any of the goods supplied under this purchase order do not comply
> with Seller's representations or samples, or fail to comply with [the]
> governmental standards or regulations or fail to be merchantable or

---

[3] EF contends the correct date of this purchase order is May 10, 2017.

8

> fit for their intended use, or if Seller fails to exactly comply with the purchase order, Seller shall be liable to Lakeshore for all resulting damages, losses, expense[s,] and injury. Under any of those circumstances, Lakeshore shall also have the right to reject the goods and return them at the Seller's expense.

[LS SMF ¶ 11, 13, Doc. 61 ¶ 11, 13].

After the Closing Date, EF asserts that it sold and shipped certain carpet to Lakeshore from November 6, 2017, until February 28, 2018. [BLT SMF ¶ 20; Doc. 112 ¶ 20]. EF asserts that on or after the Closing Date, it sold and shipped certain carpet to Lakeshore that was either tufted and coated by Beaulieu, tufted by Beaulieu and coated by EF, and/or tufted and coated entirely by EF (in which Beaulieu had no involvement in the manufacturing process). [BLT SMF ¶ 21; Doc. 112 ¶ 21].

In an email dated on the Closing Date, EF Territory Manager, Steve Cvitanovich explained to Lakeshore's Jeff Champlin that "there will certainly be some bumps in the road as we merge the two companies [Beaulieu and EF] together." [LS SMF ¶ 15, Doc. 61 ¶ 15]. EF attempted to fill the Pre-Closing POs. [LS SMF ¶ 18, Doc. 61 ¶ 18]. The invoices EF submitted to Lakeshore for the Pre-Closing POs, contained the language, "Engineered Floors DBA Beaulieu Group." [LS SMF ¶ 19, Doc. 61 ¶ 19]. In correspondence received from EF dated November 6, 2017, EF explained that "customers will continue to call the Beaulieu customer service number, 1-800-267-6638 for placing orders until further notice." [LS SMF ¶ 20, Doc. 61 ¶ 20]. After the sale of Beaulieu's assets to EF, EF continued to accept and negotiate checks issued to Beaulieu. [LS SMF ¶ 21, Doc. 61 ¶ 21]. After the close of the APA, EF shipped products to fill the Pre-Closing POs. [LS SMF ¶ 22, Doc. 61 ¶ 22].

When Lakeshore submitted claims to EF for defective products delivered by EF, Steve Cvitanovich stated to Lakeshore's Yannen Madrigal in an e-mail dated December 13, 2017,

that: "Claims like these are denied because invoices are dated before engineered floors purchased Beaulieu. Claims automatically sends out this typical response.[4] You don't have to do anything on your side. I anticipate that this will be going on for some time until we work through these old invoices that were invoiced by Beaulieu." [LS SMF ¶ 28, Doc. 61 ¶ 28].

On July 3, 2018, EF filed the EF Claim against the Debtors in an unliquidated amount, asserting contingent and unliquidated claims against the Debtors for any amounts for which the Debtors are or should be liable (including by way of illustration and not limitation any and all post-petition warranty claims and product liability claims of Lakeshore and any other customers of the Debtors who have asserted or may assert claims against EF). [BLT SMF ¶ 22; Doc. 112 ¶ 22].

On August 3, 2018, Lakeshore filed a Summons and Complaint in the Superior Court of the State of California, County of Los Angeles-South Central District against EF seeking damages on a variety of theories (the "California Action"). [BLT SMF ¶ 23; Doc. 112 ¶ 23; AC ¶ 3; Doc. 84 ¶ 3]. A copy of the Superior Court complaint filed with the original complaint in this adversary proceeding shows counts for (1) breach of implied-in-fact contract, (2) breach of contract, (3) breach of implied warranty of merchantability, (4) breach of implied warranty of fitness for a particular purpose, (5) breach of express warranties, (6) fraud, (7) negligent misrepresentation, (8) breach of the implied covenant of good faith and fair dealing, and (9) declaratory relief. [Doc. 1, Ex. C]. On September 14, 2018, EF commenced this adversary proceeding. [BLT SMF ¶ 24; Doc. 112 ¶ 24]. Lakeshore raised the same claims it raised in the California Action as counterclaims in this proceeding, except for the fraud claim. [Doc. 15].

---

[4] LS SMF includes the statement "With Lakeshore's account, I will forward to my boss to credit these denied claims." In its response, EF did not include this sentence, but admitted the statements above. Neither this sentence nor the others contained in paragraph 28 of LS SMF are material to the Court's decision.

On October 30, 2018, Lakeshore filed its Request for Allowance and Payment of Administrative Expense Claim Pursuant to 11 U.S.C. § 503 (the "Lakeshore Claim"), asserting breach of warranty claims totaling $1,444,622.42 relating to allegedly non-conforming and defective products sold to Lakeshore by the Debtors and/or EF. [BLT SMF ¶ 28; Doc. 112 ¶ 28]. Lakeshore and the Liquidating Trustee subsequently engaged in negotiations resulting in an agreement resolving the Lakeshore Claim. [BLT SMF ¶ 29; Doc. 112 ¶ 29]. On April 30, 2020, the Liquidating Trustee filed a motion for approval of the settlement, EF objected to the motion, and a hearing was held on the motion. [BLT SMF ¶ 30-31; Doc. 112 ¶ 30-31]. On June 2, 2020, the Court entered an order approving the settlement. [BLT SMF ¶ 32; Doc. 112 ¶ 32].

IV.    **Analysis**

A.  **Jurisdiction**

As a threshold matter, the Court will consider whether it has subject matter jurisdiction over this proceeding. EF argues that because Lakeshore has denied notice of the Sale Order and denied that it is bound by the Sale Order there is a question of subject matter jurisdiction. The Court must always consider the question of whether it has subject matter jurisdiction to hear a case. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514, 126 S. Ct. 1235, 1244 (2006).

Pursuant to 28 U.S.C. § 1334(b) "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." This provision creates jurisdiction in three categories of proceedings: those that "arise under title 11," those that "arise in cases under title 11," and those "related to cases under title 11." The jurisdiction of the bankruptcy court is derived from and dependent upon these three bases. *Celotex Corp. v. Edwards*, 514 U.S. 300, 307, 115 S. Ct. 1493, 1498 (1995).

Matters which "arise under" title 11 are matters which invoke a substantive right created by the Bankruptcy Code. *Toledo v. Sanchez (In re Toledo)*, 170 F.3d 1340, 1345 (11th Cir. 1999). Matters that "arise in a case under" title 11 generally are administrative type matters or "matters that could arise only in bankruptcy." *Id.* (citing *Wood v. Wood (In re Wood)*, 825 F.2d 90, 97 (5th Cir.1987)). Matters that are "related to" are matters where

> the outcome of the proceeding could conceivably have an effect on the estate being administered in bankruptcy. The proceeding need not necessarily be against the debtor or the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.

*Id.* (quoting *Miller v. Kemira, Inc. (In re Lemco Gypsum, Inc.)*, 910 F.2d 784, 788 (11th Cir.1990)). The Court's jurisdiction is further divided into core jurisdiction, in which the Court has statutory authority to enter orders and judgments, and non-core jurisdiction, in which the Court requires consent of the parties to enter orders and judgments. *Wellness Intern. Network, Ltd. v. Sharif*, 575 U.S. 665, ___, 135 S. Ct. 1932, 1940 (2015); 28 U.S.C. § 157(b)(1). Without such consent, the Court must submit proposed findings of fact and conclusions of law to the district court. *Id.*

In this proceeding, EF seeks a determination of the parties' rights under the Sale Order which effectively incorporates the APA. [Sale Order ¶ 41]. The Sale Order was entered pursuant to various sections of the Bankruptcy Code, including §§ 102, 105, 363 and 365. [Sale Order ¶ E]. Because the Sale Order allows for liens to attach to proceeds of the sale under § 363(f) and for sale of the purchased property free and clear of liens, the Complaint raises matters that arise under title 11 such that the Court has core jurisdiction. *See, e.g.,* Sale Order ¶¶ 9, 11; 28 U.S.C. § 157(b)(2)(N). Furthermore, this Court has jurisdiction to interpret and enforce its own orders. *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151, 129 S. Ct. 2195, 2205 (2009).

Matters involving interpretation and enforcement of a Court's own orders are core proceedings. *See, e.g.*, *Lothian Cassidy, LLC v. Ransom*, 428 B.R. 555, 560 (E.D.N.Y. 2010) ("[M]atters involving the enforcement or construction of a bankruptcy court order fall under 'arise in' jurisdiction."); *In re Motors Liquidation Co.*, 514 B.R. 377, 381 (Bankr. S.D.N.Y. 2014) ("Bankruptcy courts ... have subject matter jurisdiction to enforce their orders in bankruptcy cases and proceedings under those courts' '*airising in*' jurisdiction.") (emphasis in original); *In re Patriot Coal Corp.*, 539 B.R. 812, 818-19 (Bankr. E.D. Mo. 2015) ("And this jurisdiction is core. '[T]he enforcement of orders resulting from core proceedings are considered core proceedings.' ... 'Requests for bankruptcy courts to construe their own orders must be considered to arise under title 11 if the policies underlying the Code are to be effectively implemented.'") (quoting *In re Williams*, 256 B.R. 885, 892 (B.A.P. 8th Cir. 2001)); *see also The LTV Corp. v. Back (In re Chateaugay Corp).*, 201 B.R. 48, 62 (Bankr. S.D.N.Y. 1996) ("Bankruptcy courts have inherent or ancillary jurisdiction to interpret and enforce their own orders wholly independent of the statutory grant of jurisdiction under 28 U.S.C. § 1334."). Therefore, the Court has subject matter jurisdiction to determine the Motions and enter final orders with respect to interpretation of the Sale Order and the APA because interpretation of the Sale Order is within the Court's core jurisdiction.

### B.  Contentions of the Parties

In its Motion, Lakeshore seeks entry of a judgment concluding that the Sale Order and APA do not grant EF immunity from liability for defective products that were manufactured in whole or part by Beaulieu and sold by EF to Lakeshore (Bucket 2 claims). In so doing, Lakeshore argues that the questions that must be answered are matters of law: interpretation of the APA and Sale Order. Lakeshore also states that the related issue of whether any liability for Bucket

2 claims should be allocated between EF and the Liquidating Trustee is a question of law that should be determined under its motion. Lakeshore joined in the Liquidating Trustee's motion. [Doc. 105].

The Liquidating Trustee argues that, notwithstanding the many claims in the Amended Complaint, the claims against the BLT Defendants all rise or fall on the Court's determining whether Lakeshore's claims are "Excluded Liabilities" as defined in the APA. The Liquidating Trustee argues further that the APA and Sale Order contemplate that the Purchased Property[5] was sold free and clear of claims existing at the time of the sale and, because no Bucket 2 claims existed at the Closing Date, and because Bucket 2 claims are not claims against the Debtors, Bucket 2 claims are not addressed by either § 2.2(d) or § 2.4 of the APA. In so arguing the Liquidating Trustee asserts that EF's argument misconstrues the APA and fails to take into account black letter law. The Liquidating Trustee also argues that, regardless of the Court's determination under the APA, it can have no liability to EF because the property purchased under the APA was sold "As Is, Where Is" without warranties such that even if the Court concludes that Lakeshore's claims against EF are "Excluded Liabilities" under the APA, the APA does not provide for indemnity or warranty of any kind to EF.

In response, EF argues that it is not liable for claims that carpet manufactured by the Debtors is defective. Rather, it argues that the APA provides it with the sole discretion to decide whether to assume any such obligations. In support of this position EF argues that the phrase "any liabilities" in § 2.2(d) means just that and is not limited to warranty claims. EF points to language in the APA that provides that any liability that is not expressly assumed is an "Excluded Liability" and not EF's responsibility. EF argues further that the APA provides that liabilities or obligations

---

[5] Capitalized terms not otherwise capitalized herein will have the meanings assigned in the APA. [Case No. 17-41677 Doc. Nos. 297, 335].

could arise post-Closing Date from claims by any customer that product manufactured by Debtors

was defective. EF also argues that it cannot fully respond to the Motions without discovery because

it asserts that Lakeshore cannot identify which carpet was shipped under which invoice and as a

result cannot identify which claims are in each category or bucket.

### C. Interpretation of the Sale Order and the APA

#### 1. Rules of Contract Construction

Under Georgia law, construction of a contract is generally a matter for the Court

unless an ambiguity cannot be resolved by the rules of contract construction. *See City of Baldwin

v. Woodard & Curran, Inc.,* 293 Ga 19, 30, 743 S.E.2d 381, 389 (2013). The cardinal rule of

contract construction is to ascertain the intent of the parties. *Bowles v. Babcock & Wilcox Co.*, 209

Ga. 858, 858, 76 S.E. 2d 703, 705 (1953); *Stonegate Bank v. TD Bank, N.A.*, 596 F. App'x 834,

841-42 (11th Cir. 2015) (stating that "Georgia courts do not take a uniform approach in applying

their state's rules of contract construction. Instead, they tend to make use of different rules on an

ad hoc basis. Only a few guiding principles exist. For example, '[t]he cardinal rule of construction

is to ascertain the intention of the parties.'") (citations omitted) (alteration in original); O.C.G.A

§ 13-2-3.  In addition, a contract is to be construed to give effect to each of its provisions and court

orders, such as the Sale Order, are to be construed similarly. O.C.G.A. § 13-2-2(4); *Iberiabank, v.

Geison (In re FFS Data, Inc.)*, 776 F.3d 1299, 1304 (11th Cir. 2015) (construing a confirmation

order and underlying plan).

#### 2. Arguments

The Liquidating Trustee specifically points to paragraph 17 of the Sale Order in

support of its argument that the sale to EF was to be free and clear of claims that existed as of the

Closing Date. Paragraph 17 states as follows:

> Except as expressly provided in the Agreement, **the Purchaser is not assuming nor shall it or any affiliate of the Purchaser be in any way liable or responsible, as a successor or otherwise, for any liabilities, debts, or obligations of the Debtors in any way whatsoever relating to or arising from the Debtors' ownership or use of the Purchased Property or operation of the Business prior to the consummation of the transactions contemplated by the Agreement**, or any liabilities calculable by reference to the Debtors or their operation of the Business or the Purchased Property, or relating to continuing or other conditions existing on or prior to consummation of the transactions contemplated by the Agreement, all of which liabilities, debts, and obligations are hereby extinguished insofar as they may give rise to liability, successor or otherwise, against the Purchaser or any affiliate of the Purchaser.

(emphasis added). The Liquidating Trustee specifically highlights the emphasized language to argue that the Sale Order provides that the property sold to EF was sold free and clear of existing claims only.[6] EF does not identify the specific provisions of the Sale Order that it asserts support its position. Rather, it relies on § 2.2(d) and the portion of § 2.4 of the APA highlighted below in support of its position that the Liquidating Trustee is liable for Bucket 2 claims unless EF, in its sole discretion, chooses to assume liability for a claim for defective product manufactured by the Debtors.

> Section 2.2 states as follows (emphasis added):

> Assumption of Liabilities. **The Buyer shall assume and the Buyer hereby agrees to pay, perform and discharge when due, the Assumed Liabilities, and obligations of the Seller arising after the Closing Date relating to the Purchased Property.** For purposes of this Agreement, "Assumed Liabilities" include all of the following:

> (a) all liabilities, obligations and duties arising after the Closing under any and all Assumed Executory Contracts and Unexpired Leases;

---

[6] Similarly, Lakeshore points to paragraph 17 and paragraph 36 of the Sale Order in its initial brief [Doc. 33] to support its argument that EF cannot be held responsible for the Debtors' pre-closing liabilities but that EF is not protected from liability for products that EF chose to introduce into the stream of commerce after the Closing Date.

(b) all obligations and liabilities of the Seller with respect to Transferred Employees to the extent provided in Section 10 of this Agreement;

(c) Cure Costs, but only as and to the extent set forth in Section 2.5(a) of this Agreement;

(d) at the Buyer's sole discretion following the Closing to be determined on a case-by-case basis, any liabilities to repair or replace, or to refund the sales price (plus commercially reasonable related expenses) of Products manufactured by the Seller which any customer claims to be defective, or liabilities arising under warranties issued by the Seller;

(e) all Transaction Taxes to the extent payable by the Buyer pursuant to Section 11.1; and

(f) all liabilities set forth on Schedule 2.2(e).[7]

And § 2.4 states as follows (emphasis added):

Excluded Liabilities. **Notwithstanding anything herein to the contrary, the Buyer shall not assume or have any responsibility with respect to any obligations or liability of Seller of whatever nature, whether presently in existence or arising hereafter, that is not expressly included within the definition of Assumed Liabilities,** including but not limited to:

(a) Taxes related to the Business or the Purchased Property for all Tax periods (or portions thereof) ending on or prior to the Closing or any other Taxes of the Seller for any taxable period;

(b) any costs or expenses incurred in connection with, or related to, the administration of the Bankruptcy Case, including, without limitation, any accrued professional fees and expenses of attorneys, accountants, financial advisors and other professional advisors related to the Bankruptcy Case;

(c) liabilities to the extent relating to the Excluded Assets;

(d) liabilities and obligations of the Seller under this Agreement;

(e) all intercompany obligations, liabilities and Indebtedness, including any note indebtedness, owed by the Seller to any Affiliates of the Seller;

(f) any obligation to any current or former employee of the Seller who is not a Transferred Employee; and

(g) any claim of any current or former employee of the Seller who is not a Transferred Employee or any claim of a Transferred Employee arising from the period prior to the Closing.

---

[7] Schedule 2.2(e) states "none". [Case No. 17-41677, Doc. 344]

The Liquidating Trustee focuses on the highlighted portion of § 2.2 in arguing that EF assumed both the defined list of Assumed Liabilities and "obligations of the Seller arising after the Closing Date relating to the Purchased Property." In contrast, EF argues that it only assumed the specific obligations set forth in subsections (a) through (f) and, with respect to those identified in subsection (d), it would assume only those it specifically agreed to on a case-by-case basis in its sole discretion. EF reaches this conclusion because the APA says, "Notwithstanding anything [in the APA] to the contrary" if an obligation is not an Assumed Liability it is an Excluded Liability and EF is not liable for it. [*See* APA § 2.4].

### 3. Scope of § 2.2

Initially, the Court will consider what obligations are assumed in § 2.2 and specifically what obligations are identified in subsection (d).  EF argues that limiting the types of claims addressed in (d) to warranty claims is not consistent with the terms of the APA, and the Court agrees. Subsection (d) by its terms covers two types of liabilities: those arising from "Products manufactured by the [Debtors] which any customer claims to be defective" (the "Product Defect" clause) and those "arising under warranties issued by the [Debtors]" (the "Warranty" clause).

With respect to the Product Defect clause, § 2.2(d) provides that EF has discretion to assume "any liabilities to repair or replace, or to refund the sales price (plus commercially reasonable related expenses) of" certain products claimed to be defective. Thus, the APA contemplates that EF may assume only damages of a type recoverable on a contract claim (cost to repair, replace, or refund) and not the type recoverable on a tort claim for injury to person or property. This is consistent with Georgia's economic loss rule for product defect claims, which provides that "absent physical injury or harm to property other than the defective product itself, a

18

plaintiff may not recover in tort but must pursue a warranty claim. The economic loss rule bars recovery for purely economic losses under both negligence and strict liability claims." Ga. Products Liability Law § 13:6 (4th ed.) (noting exceptions for accidents resulting from "a sudden, calamitous event that not only causes damage to the product but poses an unreasonable risk of injury to persons and other property"; for "passive concealment or fraud"; and for "willful or wanton" torts.) Therefore, it appears that the Debtors and EF anticipated that any product defect claims covered by subsection (d), whether or not arising from a warranty, would be contractual in nature. And, indeed, Lakeshore has not asserted any product defect claims sounding in tort.[8] As a result, the Court will limit its discussion to warranty claims.

### 4. Privity of Contract

Georgia law requires that the parties to a contract action be in privity of contract, such that "only parties to a contract may sue to enforce it." *Patrick Molloy Communities, LLC v. Community & Southern Bank*, 334 Ga. App. 76, 79, 778 S.E.2d 242, 245 (2015).  EF argues that Lakeshore, the Debtors, and EF were in privity of contract either directly or indirectly under the APA  such that the Debtors remain liable for any claims that the carpet it manufactured is defective. However, with respect to warranty claims, the relevant contract is the sales contract which contains and creates the warranties, and not the APA.

The Uniform Commercial Code ("U.C.C.") as adopted in Georgia governs warranties in contracts for the sale of goods. *Decatur North Assoc., Ltd. v. Builders Glass, Inc.*, 180 Ga. App. 862, 863-64, 350 S.E.2d 795, 796-97 (1986) (distinguishing *Stewart v. Gainesville*

---

[8] The Court offers no opinion on whether Lakeshore could bring a negligence-based product liability claim under Georgia law notwithstanding the economic loss rule. However, only natural persons can assert a strict liability claim against a manufacturer for product defects. O.C.G.A. § 51-1-11(b); Ga. Products Liability Law §§ 2:7, 10:1 (4th ed.) ("Because O.C.G.A. § 51-1-11(b)(1) grants a statutory cause of action only to 'natural persons,' corporations and other entities may not sue under Georgia's products liability statute.").

*Glass Co., Inc.*, 131 Ga. App. 747, 206 S.E.2d 857 (1974), *aff'd by* 233 Ga. 578, 212 S.E.2d 377 (1975), because it involved the sale of goods and was controlled by the provisions of the U.C.C. which limit privity). With respect to express warranties, the "warranty runs only to the original purchaser *except* where it appears 'that both parties to the contract intended that a third person should be the beneficiary.'" *Chem Tech Finishers, Inc. v. Paul Mueller Co.*, 189 Ga. App. 433, 375 S.E.2d 881 (1988) (emphasis in original) (quoting *Stewart*, 131 Ga. App. At 753, 206 S.E.2d at 860). Implied warranties "extend only to the buyer of the goods and certain members of her household" and "Georgia courts have repeatedly held that where a plaintiff lacks contractual privity with a manufacturer, he cannot bring an implied warranty claim against that manufacturer." *Gill v. Blue Bird Body Co.*, 147 F. App'x 807, 809-10 (11th Cir. 2005) (noting the exception for family members provided in O.C.G.A. § 11-2-318).[9]

Because the Warranty clause in subsection (d) applies only to liabilities "arising under warranties issued by the [Debtors]," then the necessary privity between Beaulieu and Lakeshore could be established to the extent the Debtors issued warranties to Lakeshore for the Bucket 2 carpet. In contrast, if the Debtors did not issue any warranties to Lakeshore for the Bucket 2 claims, then not only would the parties lack privity, but subsection (d) would, by its terms, not apply.

Article 2 controls when Lakeshore's claims arose and what warranties, if any, were issued by the Debtors. *Olé Mexican Foods, Inc. v. Hanson Staple Co.*, 285 Ga. 288, 288, 676 S.E.2d 169, 170 (2009) (citing *Heart of Texas Dodge, Inc. v. Star Coach, LLC*, 253 Ga. App. 801, 567 S.E.2d 61 (2001)). The Liquidating Trustee argues that a breach of warranty arises when tender

---

[9] EF also cites O.C.G.A. §51-1-6 in support of its privity argument.  However, as previously noted Lakeshore has not raised tort claims and this section is inapplicable and does not change the Court's analysis.

of delivery is made as provided in O.C.G.A. § 11-2-725(2).[10] The concept of tender of delivery is set forth in O.C.G.A. § 11-2-503 which in relevant part states that the seller must "put and hold conforming goods at buyer's disposition and give the buyer any notification reasonably necessary to enable him to take delivery." O.C.G.A. § 11-2-503(1). "The manner, time, and place for tender are determined by the agreement" and by Article 2. *Id.* Express warranties "by the seller" are made as part of the contract of sale while implied warranties of merchantability and fitness for a particular purpose are implied in a contract for sale unless excluded or modified. O.C.G.A. §§ 11-2-313, -314, -315. Thus, each of the obligations that determine when a warranty arises is placed on the seller by Georgia law.

It is undisputed that EF was the seller of product to Lakeshore with respect to Bucket 2 claims. [AC ¶¶ 32, 33(a), (b) & Ex. D; Doc. 84, ¶¶ 32, 33][11]. It necessarily follows that any agreement for the sale of product must be between EF and Lakeshore,[12] and any express or implied warranties issued were issued by EF and not by the Debtors. Because this is so, Lakeshore's claims do not fall into either category of liability under § 2.2(d) as there is no privity of contract between Lakeshore and the Debtors.

### 5. Other Relevant Contractual Language

The Court disagrees with EF's analysis of the obligations it is responsible for under the APA for several reasons in addition to the foregoing. First, and foremost, construing § 2.2(d) as EF advocates causes other provisions of the APA to become meaningless thereby violating a significant rule of contract construction. O.C.G.A. § 13-2-2(4); *FFS Data,* 776 F.3d at 1304 ("An

---

[10] "A breach of warranty occurs when tender of delivery is made" absent any specific extension of the warranty to further performance. O.C.G.A. § 11-2-725(2).
[11] *See supra* pages 24-25.

[12] *See* O.C.G.A. §§ 11-2-204(1), -206(1)(b).

interpretation giving 'reasonable meaning to all provisions of a contract is preferred to one which leaves a part useless or inexplicable.'") (citations omitted); *Board of Regents v. A.B. & E., Inc.,* 182 Ga. App. 671, 674, 357 S.E.2d 100, 103 (1987) ("It is well established that a court should avoid an interpretation of a contract which renders portions of the language of the contract meaningless.") (citation omitted); *Horwitz v. Weil,* 275 Ga. 467, 468, 569 S.E.2d 515, 516 (2002) (quoting *Georgia Farm Bureau Mut. Ins. Co. v. Gaster,* 248 Ga. App. 198, 199, 546 S.E.2d 30, 31 (2001)) ("The contract is to be considered as a whole, and each provision is to be given effect and interpreted so as to harmonize with the others.").

The Product Defect clause in § 2.2(d) provides EF with discretion over liabilities arising from "Products *manufactured* by the Seller which *any customer* claims to be defective." EF argues that by using the term "manufactured" rather than the term "sold," the Product Defect clause applies to any carpet manufactured by the Debtors regardless of who sold it. In addition, EF argues that the phrase "any customer" refers to any customer whether EF's future customer or the Debtors' present or former customer. The Liquidating Trustee argues that "any customer" refers to customers of the Debtors. If EF's reading of § 2.2(d) is correct, then a portion of § 2.2 is rendered meaningless and § 2.6 is effectively read out of the APA with respect to inventory purchased by EF. Section 2.6 states:

> Disclaimer. THE BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPLICITLY PROVIDED IN THIS AGREEMENT, **THE PURCHAED PROPERTY IS BEING SOLD AND TRANSFERRED TO THE BUYER "AS IS, WHERE IS", AND THE SELLER MAKES NO REPRESENTATIONS OR WARRANTIES** WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATED TO THE PURCHASED PROPERTY, WITHOUT LIMITING THE FOREGOING, THE SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED

PROPERTY. THE BUYER FURTHER ACKNOWLEDGES THAT **THE BUYER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE PURCHASED PROPERTY**, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS AGREEMENT, THE BUYER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPTECTIONS AND INVESTIGATIONS.

[APA § 2.6 (emphasis added)].

If EF's reading of § 2.2(d) is correct, then the provisions of § 2.6 which state that EF purchased inventory as-is without any warranty whatsoever from the Debtors and with the acknowledgement that it inspected and investigated the physical condition of the Purchased Property are rendered meaningless. Section 2.6 contemplates that the risk of putting the Purchased Property into the stream of commerce will fall on EF. EF argues that the Liquidating Trustee seeks to use § 2.6 of the APA to avoid its duty of good faith and to avoid its obligations under the APA.

The Court cannot agree because § 2.6 is unambiguous in its exclusion of any warranty from the Debtors to EF and in placing the responsibility for determining the quality of product on EF based upon its due diligence and inspection of the purchased assets. Further, as the Liquidating Trustee argues, there are no provisions in the APA that provide for indemnity. The general rule in Georgia is that unless "it is explicitly stated in the agreement, the indemnitor will not be held responsible for acts attributable to the indemnitee's own negligence." *Ryder Integrated Logistics, Inc. v. Bellsouth Telecomm., Inc.*, 277 Ga. App. 679, 682, 627 S.E.2d 358, 362 (2006), *reversed on other grounds by* 281 Ga. 736, 642 S.E.2d 695 (2007); *Service Merchandise Co. v. Hunter Fan Co.*, 274 Ga. App. 290, 296, 617 S.E.2d 235, 240 (2005). The APA explicitly makes it EF's responsibility to inspect the Purchased Property and, to the extent EF failed to detect

defective product[13] and sold the same, there is nothing in the APA that allows EF to seek to recover from the Debtors.

Limiting the scope of the "any customer" language in § 2.2(d) to customers of the Debtors gives effect to the language of § 2.2 emphasized by the Liquidating Trustee, that is, that in addition to the Assumed Liabilities EF agreed "to pay, perform and discharge when due, . . . obligations of the Seller arising after the Closing Date relating to the Purchased Property." If the Debtors were held liable for a defect claim because of its manufacture of product sold by EF, this provision would be nullified and as discussed further below, would nullify a primary purpose of § 363 sales. Construing § 2.2(d) to refer only to customers of the Debtors means that, if the Debtors sold carpet to a customer, and that customer determined the product was defective after the Closing, EF has the discretion to assume or decline the obligation to repair or replace the product. Reading each of the terms of §§ 2.2 and 2.6 limits the Debtors' responsibility for any defective product claims to those that arose prior to the Closing Date because they are based upon carpet manufactured and sold by the Debtors. This construction of the whole of § 2.2 is reasonable because it allows EF to make a business decision about assuming any obligation related to the Debtors' sales to its customers based upon the perceived importance of the customer to EF and EF's desire to do business with such customer while giving effect to the entirety of the contract language.

This construction also effectuates the provisions of § 2.4 of the APA regarding Excluded Liabilities because, by its terms, § 2.4 only addresses "any obligations or liability of [Beaulieu]" and not any independent liabilities of EF. As discussed above, warranty claims based upon sales by EF were never liabilities of the Debtors and therefore could not be Excluded

---

[13] The Court expresses no opinion whether any Purchased Product was defective. Any such finding must await further proceedings and proof of Lakeshore's claims.

Liabilities. The APA expressly puts the risk on EF for the quality of product sold after the Closing Date.

EF contends that the Liquidating Trustee ignores the definition of "Sales Obligations" in the APA in the Liquidating Trustee's argument that EF is responsible for product liability claims because EF put the carpet into the stream of commerce. The Court agrees with EF that the definition of Sales Obligations refers to the Debtors' contracts to sell product to customers, such as Lakeshore. However, Sales Obligations are Excluded Assets under the APA and were not purchased by EF. [APA § 2.3(n) (Excluded Assets include "all Non-Assumed Contracts and Leases," which in turn is defined as "any Contract to which the Seller is a party but that is not an Assumed Executory Contract and Unexpired Lease")].[14] As a result, any sale by EF resulted not from a pre-Closing Date contract between the customer and the Debtors but rather from a separate post-Closing Date contract between the customer and EF. Thus, such sales result in obligations of EF based on EF's decision to sell to a customer product it inspected and investigated. The Court agrees with Lakeshore and the Liquidating Trustee that because there was no assumption of the obligation to fulfill the Pre-Closing POs, EF assumed any liability that arose from filling these orders as EF had no obligation to do so.[15]

---

[14] In its response to the LS SMF's assertion that EF attempted to fill Pre-Closing POs issued by Lakeshore, EF stated that "under APA Section 2.1(g) Engineered Floors bought all open purchase orders from the Debtor." [Doc. 61 ¶ 18]. Section 2.1(g) includes among the assets purchased "all open Purchase Orders with *customers and suppliers*." However, "Purchase Orders" is defined in the APA as "the Seller's [Beaulieu's] outstanding and unexpired purchase orders, contracts or other commitments *to suppliers* of goods and services for materials, supplies or other items used primarily in the Business." APA § 1 (emphasis added). Thus, the Pre-Closing POs more properly fit within the definition of Sales Obligations.

[15] To hold otherwise, would hypothetically insulate EF from liability even if it sold Bucket 2 carpet that it knew to be defective based on its inspection and investigation.

In addition to the reasons discussed above, the Liquidating Trustee points to § 15.15 in support of its argument that the sale was free and clear of existing claims only. Section 15.15 states:

> No Successor Liability. **The parties intend that, except where prohibited under applicable law, upon the Closing, the Buyer shall not be deemed to**: (i) be the successor of the Seller, (ii) have, defacto or otherwise, merged with or into the Seller, (iii) be a mere continuation or substantial continuation of the Seller or the enterprise of the Seller, or (iv) **be liable for any acts or omissions of the Seller** in the conduct of the Business or **arising under or related to the Purchased Property other than as set forth in the Agreement. Without limiting the generality of the foregoing and except as otherwise provided in this Agreement, the parties intend Buyer shall not be liable for any bankruptcy claims, other claims, causes of action, complaints, investigations or other proceedings against the Seller, and the Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Purchased Property or any obligations of the Seller arising prior to the Closing Date,** including, without limitation, liabilities on account of any Taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Business or the Purchased Property prior to the Closing, except as expressly provided in this Agreement.

(emphasis added). The intent of the parties as stated in the APA is that EF be protected from obligations or liabilities that arose prior to the Closing Date. Considering the language of the entire provision, the Court concludes that claims attaching to the proceeds of the sale are limited to those that arose prior to the Closing Date. Specifically, § 15.15 provides that EF will not be liable for the Debtors' operation of their business, which would include manufacturing, other than as set forth in the APA, that is in sections 2.2, 2.3, and 2.4, and this includes, but does not limit EF's protection against successor or vicarious liability, whether known, unknown or contingent that arises prior to the Closing Date.

This is consistent with and effectuates the overall purpose of the APA, that is to sell substantially all of the Debtors' assets to EF so that EF could operate its business with the Debtors' assets without liability for any of the Debtors' existing liabilities or obligations and so that the Debtors could eliminate any further expense or liability from operating their business. In order to facilitate those twin goals, the Debtors' liability would necessarily have to be cut off as of the Closing Date and any sales of inventory by EF would be EF's responsibility as opposed to the Debtors'. This does not mean that the Debtors would not be liable for claims that arose post-filing or even post-Closing if any such claims were the result of the Debtors' operation of their business including manufacture and sale of product. Rather, these claims would attach to the proceeds of sale. But, the Debtors are not liable for the costs of EF operating its business post-Closing with assets it purchased under the APA. Furthermore, the Sale Order is consistent with this interpretation of the APA. [*See* Sale Order ¶¶ 17, 32, 34, 36].

### 6. Harmony With the Bankruptcy Code and Policies

For similar reasons, this common sense construction effectuates the basic principles underlying § 363 sales in bankruptcy by providing an end to the Debtors incurring liability and allowing the purchaser to obtain assets it can use in business, in this proceeding inventory, free and clear of claims that existed as of the Closing Date. Thus, liability arising from the Debtors' operation of their business pre-Closing Date attaches to the proceeds of the sale while liability arising from EF's use of the Purchased Property in operation of its business is EF's responsibility.

### 7. Summary

For all these reasons, the Court finds that the APA makes Bucket 1 claims the BLT Defendants' responsibility and Bucket 2 and 3 claims EF's responsibility and not the responsibility of the Liquidating Trustee. Because the APA and the Sale Order provide the answers to the issue

of which party is liable, to the extent Lakeshore can establish its claims, the Court need not address apportionment of damages as there is no dispute as to liability for Bucket 1 claims and the Liquidating Trustee has no responsibility for Bucket 2 or 3 claims such that there can be no apportionment or contribution claim against the Liquidating Trustee by EF.

In addition, because interpretation of the APA and the Sale Order are matters for the Court to decide and the undisputed facts are sufficient for the Court to rule, there is no need for additional discovery by EF. As a result, the Court will deny EF's motion to compel [Doc. 126]. The Court will rule on a separate motion to compel by EF with respect to Lakeshore and on Lakeshore's motion for protective order in conjunction with the Court's consideration of Lakeshore's Amended Motion to Sever. [Docs. 101, 113, 88, 29, 83].

### D. Application

#### 1. BLT Defendants' Motion for Summary Judgment

In Count 1, EF asserts a claim for a declaratory judgment[16] that

> upholds and enforces the APA's and Sale Order's provisions protecting Engineered Floors from successor liability and other claims wrongfully asserted against it by Lakeshore, that declares the Liquidating Trustee is liable to Lakeshore for any claims that carpet manufactured by the Debtor is defective, that declares any claims carpet manufactured by the Debtor is defective (even if sold by Engineered Floors) must be brought through the bankruptcy administrative claim process, and that declares the Liquidating Trustee, not Engineered Floors, is liable to Lakeshore for any alleged lack of notice of the Bankruptcy or Sale.

[AC ¶ 76]. Under the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction …any court of the United States … may declare the rights and other legal relations of any interested party seeking such a declaration…." 28 U.S.C. § 2201(a). The controversy must be

---

[16] For those claims asserted against both the Liquidating Trustee and Lakeshore, the Court will only analyze whether the Liquidating Trustee is entitled to judgment as a matter of law and will make no determination as to the claims against Lakeshore.

a substantial and continuing one. *A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*, 925 F.3d 1205, 1210 (11th Cir. 2019). It "cannot be 'conjectural, hypothetical, or contingent; it must be real and immediate, and create a definite, rather than speculative threat of future injury.'" *Id.* (quoting *Emory v. Peeler*, 756 F.2d 1547, 1552 (11th Cir. 1985)). Here, there is no basis to grant a declaratory judgment to EF because Lakeshore has only asserted breach of warranty claims against EF with regard to the Bucket 2 and Bucket 3 carpet. As explained above, the BLT Defendants have no liability under the APA and Sale Order for warranties on the Bucket 2 claims because any such warranties were issued by EF and not by the Debtors. Additionally, there is no legal theory under which the BLT Defendant can be liable for Bucket 3 claims, and EF does not argue for such liability. Therefore, the Court will grant summary judgment to the BLT Defendants on Count 1 of the Amended Complaint.

In Count 2, EF asserts a claim for specific performance of the APA and Sale Order, contending that the Liquidating Trustee "has a continuing duty to abide by and uphold the APA and Sale Order, to not diminish or undermine Engineered Floors' claims, rights, remedies, privileges and protections under the APA and Sale Order, and to avoid facilitating violations of the APA and Sale Order by Lakeshore." [AC ¶ 83]. Specific performance "is an extraordinary, equitable remedy, which will only be granted if the complainant does not have an adequate remedy at law." *Clayton v. Deverell*, 257 Ga. 653, 654, 362 S.E.2d 365, 366 (1987) (citing O.C.G.A. § 23-2-130). Because the Court has ruled that the Liquidating Trustee is not liable for the Bucket 2 or Bucket 3 warranty claims under the APA, EF cannot establish that the Liquidating Trustee has failed to perform its obligations under the APA, and therefore the Court has no basis to order specific performance. Accordingly, the Court will grant summary judgment to the BLT Defendants on Count 2 of the Amended Complaint.

In Count 3, EF asserts claims for breach of contract and duty of good faith and fair dealing to the extent the Liquidating Trustee "seeks to avoid paying certain of the Excluded Liabilities and to instead shift to Engineered Floors the responsibility for paying such liabilities" and to the extent "any actions taken, aided and abetted, or encouraged by the Liquidating Trustee result in a violation or breach of the APA's protections of Engineered Floors[.]" [AC ¶¶ 92, 93]. To establish breach of contract, the plaintiff must show "(1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." *Norton v. Budget Rent A Car System*, 307 Ga. App. 501, 502, 705 S.E.2d 305, 306 (2010). The duty of good faith and fair dealing is an implied covenant in every contract that does not provide an independent basis for liability. *Mbigi v. Wells Fargo Home Mortg.*, 336 Ga. App. 316, 327, 785 S.E.2d 8, 19 (2016). Therefore, to establish breach of the duty of good faith and fair dealing, the plaintiff must show that the defendant owed a contractual obligation and that it violated the implied duty. *Id.* These claims fail for the same reason that Count 2 fails: the Liquidating Trustee has no liability for Bucket 2 or Bucket 3 warranty claims under the APA, and no other product defect claims for which the Liquidating Trustee might be liable have been asserted. As a result, the Liquidating Trustee has not breached any of its obligations under the APA with regard to the Bucket 2 or Bucket 3 warranty claims. In addition, neither the APA nor any implied covenant requires the Liquidating Trustee to take action to prevent EF's customers from suing EF on such claims. Therefore, the Court will grant summary judgment to the Liquidating Trustee on Count 3 of the Amended Complaint.

In Count 4, EF asserts claims for money had and received and constructive trust based on the Liquidating Trustee's alleged failure to fulfill its obligation to provide notice to Lakeshore of the bankruptcy case and the Sale Motion, which has resulted in Lakeshore's claims against EF. EF alleges that the Liquidating Trustee "is attempting to disavow and breach the APA

and/or prevent proper enforcement of the APA and Sale Order" and that the Liquidating Trustee "should not in good conscience and equity be allowed to retain all of the remaining Sale Proceeds while at the same time Engineered Floors is subjected to, and must incur costs defending, claims that violate the APA and Sale Order." [AC ¶ 101, 103]. A claim for money had and received requires the plaintiff to show "that an entity has received money justly belonging to another" and that the plaintiff "made a demand for payment and was refused." *City of Atlanta v. Hotels.com*, 289 Ga. 323, 328, 710 S.E.2d 766, 770 (2011). A constructive trust "is impressed upon property when it is against equity that the person holding title to the property be allowed to enjoy the beneficial interest in the property." *St. Paul Mercury Ins. Co. v. Meeks*, 270 Ga. 136, 137, 508 S.E.2d 646, 648 (1998); O.C.G.A. § 53-12-132(a). The material facts show that the Liquidating Trustee has not breached the APA and therefore it is not holding the proceeds of the APA unjustly. Because EF has not prevailed on its claim for money had and received, the Court has no basis to impose the remedy of a constructive trust. Accordingly, the Court will grant summary judgment to the Liquidating Trustee on Count 4 of the Amended Complaint.

In Count 5, EF asserts a claim for unjust enrichment to the extent the Liquidating Trustee "is permitted … to avoid paying Excluded Liabilities under the APA and/or to shift to Engineered Floors any losses or damages resulting from Lakeshore's claims that it did not receive proper notice of the Bankruptcy or the Sale[.]" [AC ¶ 106]. "Unjust enrichment is an equitable concept and applies when as a matter of fact there is no legal contract, but when the party sought to be charged has been conferred a benefit by the party contending an unjust enrichment which the benefitted party equitably ought to return or compensate for." *Sitterli v. Csachi*, 344 Ga. App. 671, 673, 811 S.E.2d 454, 457 (2018) (citations and quotation marks omitted). EF cannot prevail on a claim for unjust enrichment because the relationship between EF and the Liquidating Trustee is

governed by a contract, whose validity has not been challenged and which EF is seeking to enforce. Furthermore, because the Liquidating Trustee has not breached the APA with regard to the Bucket 2 or Bucket 3 warranty claims, it has not been unjustly enriched, and EF is not entitled to a constructive trust. Accordingly, the Court will grant summary judgment to the Liquidating Trustee on Count 5 of the Amended Complaint.

In Count 6, EF asserts a claim for apportionment, indemnity and contribution under O.C.G.A. §§ 51-12-32,[17] -33[18] "to the extent Lakeshore establishes that Engineered Floors sold to Lakeshore carpet manufactured by the Debtor, and such carpet is in fact proven defective, and Engineered Floors is not afforded full protection from liability for such claims under the APA and Sale Order[.]" [AC ¶ 111]. A claim for indemnity may arise "either by terms of a contract or by operation of law, such as where negligence has been imputed to [the complainant] based on another's tort." *Havenbrook Homes, LLC v. Infinity Real Estate Inv., Inc.*, __ Ga. App. __, 847 S.E.2d 840, 846 (2020). Here, there is no indemnity provision in the APA, such that EF must establish indemnity based on vicarious liability. "[I]f a person is compelled to pay damages because of negligence *imputed to him* as the result of a tort committed by another, he may maintain an action for indemnity against the person whose wrong has thus been imputed to him." *Hines v. Holland*, 334 Ga. App. 292, 296, 779 S.E.2d 63, 67 (2015) (citation and internal quotation marks omitted; emphasis in original). EF cannot prevail on an indemnification claim because the Bucket 2 and Bucket 3 claims are warranty claims, not tort claims, and the warranties were made by EF

---

[17] "[W]here a tortious act does not involve moral turpitude, contribution among several trespassers may be enforced just as if an action had been brought against them jointly." O.C.G.A. § 51-12-32(a).

[18] When "an action is brought against more than one person for injury to person or property, the trier of fact … shall … apportion its award of damages among the persons who are liable according to the percentage of fault of each person." O.C.G.A. § 51-12-33(b).

rather than by the Debtors. Therefore, the Court will grant summary judgment to the Liquidating Trustee on Count 6 of the Amended Complaint.

In Count 8, EF seeks allowance of an administrative expense claim for amounts recovered by Lakeshore from EF for warranty claims that are Excluded Liabilities and for amounts by which the estate has been enriched at EF's expense or caused EF to incur costs defending Lakeshore's claims. The Liquidating Trustee also seeks summary judgment on its counterclaim objecting to the EF Claim.

The EF Claim is in an unliquidated amount and asserts contingent and unliquidated claims against the Debtors for any amounts for which the Debtors are or should be liable, including without limitation, post-petition warranty claims and product liability claims. An administrative expense claim may be allowed for "the actual, necessary costs and expenses of preserving the estate[.]" 11 U.S.C. § 503(b)(1)(A). The burden of proof is on EF to establish its entitlement to an administrative expense claim. *See In re New Power Co*., 313 B.R. 496, 501 (Bankr. N.D. Ga. 2004) (Drake, J.).

The Court has concluded that the APA and the Sale Order provide that the Debtors remain responsible for warranty and product liability claims that arose from their sale of product to customers, *i.e.*, Bucket 1 claims. Sales and operations ceased as of the Closing on November 6, 2017, such that no conduct after that date could give rise to Bucket 1 claims without regard to whether pre-Closing product defects may have been discovered thereafter. The specific Bucket 2 claims at issue in this proceeding are not included in § 2.2(d) and are not Excluded Liabilities because the claims are not against the Debtors, but rather are claims for breach of warranties issued by EF. Consequently, there can be no administrative expense claim against the Debtors for the Bucket 2 claims that Lakeshore has asserted against EF. Bucket 1 claims, on the other hand, are

the Debtors' responsibility because the Debtors sold the goods that are the subject of Bucket 1 claims and further, because Lakeshore has, through its settlement with the BLT Defendants, released EF from liability for any Bucket 1 claims.

The EF Claim includes any other potential warranty or product liability claims that may be asserted against EF in the future. This is acknowledged to be a contingent claim, which is sufficient basis to disallow or deny the EF Claim. *See In re Rock & Republic Enterprises*, No. 10-11728, 2011 WL 4756571, at *5 (Bankr. S.D.N.Y. Oct. 7, 2011) ("Although a *claim* may be contingent, only 'actual' administrative expenses, not contingent expenses, are entitled to priority under § 503.") (emphasis in original). However, the more important basis for disallowance is that, if a future warranty or products liability claim arises that is based on sales of product by the Debtors, EF, in its sole discretion can chose to assume any such liability and is not entitled to assert any such obligation against the Debtors because the Debtors did not agree, in the APA, to indemnify EF for its assumption of any such obligation. For these reasons, summary judgment in favor of the BLT Defendants is appropriate on their objection to claim and on Count 8 of the Amended Complaint and will be granted.

### 2. Lakeshore's Partial Motion for Summary Judgment

Lakeshore does not seek judgment on any of the counts against it, but rather seeks a determination of a threshold legal issue: whether the APA divests EF of any and all liability for post-APA product warranty claims on Bucket 2 and Bucket 3 carpet. [Doc. 49 at 2]. As explained above, the Court concludes that all express and implied warranties made to Lakeshore for Bucket 2 claims were made by EF. No such warranties were made by the Debtors. Nothing in the APA imposes liability on the Liquidating Trustee for EF's warranties. Accordingly, the Liquidating

Trustee is not liable for product warranty claims on Bucket 2 or Bucket 3 carpet, and Lakeshore is entitled to summary judgment on that legal issue.

## V.      Conclusion

In summary, the Court concludes that the APA and Sale Order, are not ambiguous and construction of the same in accordance with the Georgia rules of construction is a matter for the Court to decide. The Court has concluded that the Liquidating Trustee's interpretation of the terms of the APA is correct, as it gives meaning to all of the terms in §§ 2.2, 2.3, 2.4, 2.6 and 15.15 and the contract as a whole. The Liquidating Trustee's reading of the APA is consistent with the intention of the parties and the purpose of § 363 for the Debtors to sell substantially all of their assets free of claims as of the Closing Date while the Debtors ceased operating their business and stopped incurring liability that would arise from continued operation.

The APA provides that warranty and product liability claims that arise from the Debtors' sales of product are the responsibility of the Debtors and are not Assumed Liabilities unless EF decides in its sole discretion to assume any such claims. The APA provides that sales of Purchased Property by EF are its responsibility and any claims that arise cannot be asserted against the Debtors. This construction of the APA comports with the rule of construction that avoids an interpretation which would render any provision of the APA meaningless and is in accord with the overall purpose of the APA and a bankruptcy sale from a debtor seeking to cut off liability while allowing the purchaser to use the assets purchased to start its business. Because the Debtors did not agree to undertake any liability related to the property purchased by EF and sold by EF there is no basis upon which EF can assert a claim against the Liquidating Trust and the EF Claim will be disallowed.

Accordingly, for the reasons stated herein, it is now hereby,

ORDERED that the BLT Defendants' Motion for Summary Judgment [Doc. 94] is GRANTED; it is further

ORDERED that the EF Claim is disallowed; it is further

ORDERED that Lakeshore's Motion for Partial Summary Judgment [Doc. 47] is GRANTED; it is further

ORDERED that EF's Motion to Compel [Doc. 126] is DENIED.

**END OF ORDER**

**Distribution List**

Laura K. DiBiase
Miller & Martin PLLC
Suite 2100
1180 West Peachtree Street, NW
Atlanta, GA 30309

William A. DuPre, IV
Miller & Martin, PLLC
Suite 2100
1180 West Peachtree Street, N.W.
Atlanta, GA 30309

Matthew W. Levin
Scroggins & Williamson, P.C.
One Riverside, Suite 450
4401 Northside Parkway
Atlanta, GA 30327

J. Robert Williamson
Scroggins & Williamson, P.C.
One Riverside, Suite 450
4401 Northside Parkway
Atlanta, GA 30327

John F. Isbell
Thompson Hine LLP
Suite 1600 - Two Alliance Center
3560 Lenox Road
Atlanta, GA 30326

John K. Flock
Bradley & Gmelich LLP
700 N. Brand Blvd
10th Floor
Glendale, CA 91203

Albert F. Nasuti
Thompson, OBrien, Kemp & Nasuti, P.C.
40 Technology Parkway South
Suite 300
Peachtree Corners, GA 30092